1 | Robert Tauler  (SBN 241964)
2 | rtauler@taulersmith.com
  | J. Evan Shapiro (SBN 218481)
3 | eshapiro@taulersmith.com
  | TAULER SMITH LLP
4 | 626 Wilshire Boulevard, Suite 550
  | Los Angeles, California 90017
5 | Tel: (213) 927-9270

6 | *Attorneys for Plaintiff Dana Hughes*

7

## UNITED STATES DISTRICT COURT

8

## CENTRAL DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| DANA HUGHES, individually and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT FOR:** |
| Plaintiff, | |
| vs. | **1. VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |
| SENTRY INSURANCE COMPANY, a Wisconsin corporation; and DOES 1 through 25, inclusive, | |
| Defendants. | |

CLASS ACTION COMPLAINT

**INTRODUCTION**

1. Defendant uses data broker software on its website – https://sentry.com/ (the "Website") – to secretly collect data about a Website visitor's computer, location, and browsing habits. The data broker software then compiles this data and correlates that data with extensive external records it already has about most Californians in order to learn the identity of the Website user.

2. Defendant's installation and use of data broker software without obtaining consent is a violation of the California Trap and Trace Law.

**JURISDICTION AND VENUE**

3. This Court possesses subject matter jurisdiction over this action pursuant to the California Constitution, Article VI, Section 10. Defendant's violations of California Penal Code section 638.51 create statutory damages that exceed this Court's jurisdictional minimum. This case involves Defendant's breaches of the California Invasion of Privacy Act ("CIPA"), a critical statutory framework that protects California residents from unlawful surveillance technologies.

4. Defendant SENTRY INSURANCE COMPANY ("Defendant" or "Sentry") conducts substantial, continuous, and systematic business operations within California. Defendant maintains a West Coast regional office in Irvine, California. Defendant actively markets its insurance plans and products to businesses in California. Defendant maintains ongoing commercial relationships with California customers. Defendant derives substantial revenue from California-based transactions through its operation of the Website. Defendant deliberately avails itself of California's commercial privileges by operating its interactive Website infrastructure, which Defendant specifically designed to engage California consumers. Defendant's continuous California business activities establish general personal jurisdiction sufficient for this Court to adjudicate any claims against Defendant.

5. This Court possesses specific personal jurisdiction over Defendant

CLASS ACTION COMPLAINT
1

pursuant to California Code of Civil Procedure § 410.10 because Defendant expressly aimed and directed its tortious activities at California residents. Defendant deliberately engineered and programmed its Website with tracking technology to capture data from California-based internet users while those users browsed within California's territorial boundaries. Defendant transformed its own Website into the instrument of its unlawful surveillance in California.

6. Defendant specifically intended its surveillance operations to cause injury to California residents. Defendant configured its tracking systems on its Website to identify, profile, and exploit California users.

7. Defendant's purposeful direction of its surveillance activities at California residents through its own Website satisfies all constitutional due process requirements for the exercise of specific personal jurisdiction by this Court.

8. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## PARTIES

9. Plaintiff DANA HUGHES ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

10. Defendant is a Wisconsin corporation that owns, operates, and/or controls https://sentry.com/ (the "Website"), an online platform that offers insurance plans to businesses and related news, information and resources.

11.     Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's surveillance system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

12.     Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

13.     Sentry is the proprietor of the Website.

14.     The Website, like most other websites, can determine the approximate geolocation of its visitors once the visitors request to go to the Website on their device.  For example, it can determine the geolocation from a visitor's IP address.

15.     Defendant has partnered with registered California Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors (the "Data Brokers," and each a "Data Broker").  Defendant has done this by installing at least one Data Broker Software Development Kit on the Website.

16.     DBSDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including *a user's geolocation*, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

**Registered California Data Brokers**

17.    Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations.  Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

18.    Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

19.    Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual.  The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

20.    Data Brokers are accumulating data and profiling individuals to an alarming extent.  As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:  "We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[1]

21.    Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

---

[1] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

22.    Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on the Website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

**Defendant and the California Data Brokers**

23.    Defendant's installation and use of DBSDKs violates the California Trap and Trace law.

24.    Specifically, Defendant has installed the DBSDK of Demandbase, Inc. (the "Demandbase DBSDK") on its Website.

25.    The Demandbase DBSDK turns anonymous web traffic into identifiable leads by identifying people and accounts.

26.    First, when a user lands on a website loaded with the Demandbase DBSDK, the user's browser automatically sends an HTTP request containing his or her IP address from the user's device. The IP address provides the approximate geolocation of the device. The Demandbase DBSDK intercepts this request client-side (or via an API call server-side) to immediately grab the IP and a unique cookie ID.  The Demandbase DBSDK collects details such as pages viewed, time on page, and referring source, all tied to an "unknown visitor" profile until that visitor is mapped to a known account.

27.    Second, Demandbase then uses this information to perform a lookup against its database, determining if the visitor is coming from a known.  Demandbase also uses the persistent cookie ID to recognize repeat visits or additional behavior by the user.  Demandbase combines these web events ("engagement signals") with its own data and machine learning to identify the visitor's identity, company and other attributes.

28.    Third, in addition to on-website identification, Demandbase aggregates data across its client base to gauge "intent." If the same cookie or IP is seen on

multiple sites researching similar topics, Demandbase will classify the website visitor as "interested" in those topics. This means the Demandbase cookie effectively tracks user behavior across many websites in its network (often without user awareness).

29.    Demandbase's tracking system captures identifying signals in real time without consent. Demandbase states that its DBSDK functions by "matching engagement signals to accounts…combining proprietary data from different sources with machine learning to identify unknown engagement signals and map them back to a company."

30.    Visitors do not meaningfully consent to this identification. The tracking is third-party and occurs by default and visitors of Defendant's website are not made aware of, or able to disable this on each site.

**Plaintiff Was Subjected to the Trap and Trace Device on the Website**

31.    Plaintiff visited the Website on February 11, 2025. When Plaintiff did so, her identifying information by way of electronic impulses was sent to Demandbase. The purpose of this transfer of data from Defendant to Demandbase was for de-anonymization, profiling, and targeting. The transfer benefitted both Defendant and Demandbase financially.

32.    On information and belief, Demandbase took Plaintiff's information and added the information to its profiles of Plaintiff. In turn, Defendant received other relevant data obtained by Demandbase regarding Plaintiff. Demandbase could then use data regarding Plaintiff's visit to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement. In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest,

incarcerate, or even use lethal force."[2]

33.    The purpose of the Demandbase DBSDK is to identify users. Demandbase's own documentation confirms that its software is intended to "identify accounts, people…using our tags" promising "100% accuracy in account identification."

34.    Indeed, Demand based explains that the Demandbase DBSDK works by "matching engagement signals to accounts." This fits the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because the Demandbase process captures signaling information (who the visitor is and what they are doing) in order to identify the source or an otherwise anonymous website visit.

35.    There is no way for Plaintiff to learn what Demandbase did with Plaintiff's data, including what inferences Demandbase has gleaned from it, or when, why and to whom Demandbase has sold or licensed Plaintiff's data.  As such, Plaintiff has been injured by Defendant's surveillance practices.

36.    Plaintiff was never informed of, and therefore could not have consented to, data collection by Demandbase for mercantile purposes.  Plaintiff has no way to know the scope of the injury suffered because Demandbase operates in secret and without public disclosure of their operations.

**The Demandbase DBSDK is a Trap and Trace Device.**

37.    CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(c).

_____

[2] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

38.     The Demandbase DBSDK is a process to identify the source of electronic communication by capturing electronic impulses sent out from users' devices and identifying dialing, routing, addressing, and signaling information about or generated by users. The users are never informed that the Website is collaborating with Demandbase to obtain their phone numbers and other identifying information.

39.     The Demandbase DBSDK is "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website.  In fact, it is designed solely to meet this objective.

40.     Defendant did not obtain a court order before installing or using the Demandbase DBSDK on its Website.

41.     Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with Demandbase for the purposes of de-anonymization, profiling, and targeting.

42.     Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

43.     The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that data broker software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

## CLASS ALLEGATIONS

44.     Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

**All persons within California whose identifying information
was sent to Demandbase as a result of visiting the Website
within the limitations period.**

45.    NUMEROSITY: Plaintiff does not know the number of Class Members
but believes the number to be in the thousands, if not more. The exact identities of
Class Members may be ascertained by the records maintained by Defendant.

46.    COMMONALITY: Common questions of fact and law exist as to all
Class Members and predominate over any questions affecting only individual
members of the Class. Such common legal and factual questions, which do not vary
between Class members, and which may be determined without reference to the
individual circumstances of any Class Member, include but are not limited to the
following:

      a.    Whether the Demandbase DBSDK is a trap and trace process as
         defined by California law;

      b.    Whether Plaintiff and Class Members are entitled to statutory
         damages;

      c.    Whether Class Members are entitled to injunctive relief; and

      d.    Whether Class Members are entitled to disgorgement of
         unlawfully obtained data.

47.    TYPICALITY: As a person who visited Defendant's Website and
whose personal information was fingerprinted and de-anonymized by Demandbase,
Plaintiff is asserting claims that are typical of the Class.

48.    ADEQUACY: Plaintiff will fairly and adequately protect the interests
of the members of the Class. Plaintiff has retained attorneys experienced in the class
action litigation. All individuals with interests that are actually or potentially adverse
to or in conflict with the class or whose inclusion would otherwise be improper are
excluded.

49.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

### FIRST CAUSE OF ACTION

**Violations of California Trap and Trace Law**

**Cal. Penal Code § 638.51 (the "California Trap and Trace Law")**

50.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

51.    The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

52.    A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

53.    The Demandbase DBSDK, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c). The Demandbase DBSDK is designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

54.    Defendant did not obtain a court order before using or installing the Demandbase DBSDK on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology, including the Demandbase DBSDK, to identify visitors to its Website.

55.    CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.    An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2.    An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3.    An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4.    Statutory damages pursuant to CIPA;

5.    Reasonable attorneys' fees and costs; and

6.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: July 22, 2025                TAULER SMITH LLP

By:    */s/ Robert Tauler*
Robert Tauler, Esq.
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury.


DATED: July 22, 2025                    TAULER SMITH LLP

                                        By:    <u>*/s/ Robert Tauler*</u>
                                               Robert Tauler, Esq.
                                               J. Evan Shapiro, Esq.

                                        *Attorneys for Plaintiff*